Filed 12/21/22  P. v. Brown CA1/4

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SHAWN CHRISTOPHER BROWN,<br><br>        Defendant and Appellant. | A160767<br><br>(Solano County<br>Super. Ct. No. VCR228720)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on December 5, 2022 be modified as follows:

1. On page 27, line 3, after the first sentence of the first paragraph ending with the words "several respects," add as footnote 7 the following footnote, which will require renumbering all subsequent footnotes:

> [7] Defendant disputes the Attorney General's contention that defense counsel's failure to properly raise the first two arguments in the trial court forfeited his claims on appeal. Although defendant disputes the merits of the court's rulings and did not assert an alternative argument based on ineffective assistance of counsel, whether considered on the merits of the court's ruling or the adequacy of counsel's argument, the analysis is the same. As discussed below, any possible error was harmless."

2. On page 27, delete the following second sentence in second paragraph: "Accordingly, he now argues that counsel's failure to assert the proper grounds for admission amounted to ineffective assistance."

There is no change in the judgment.

The petition for rehearing is denied. Justice Streeter would grant the petition for rehearing.

1

Filed 12/5/22  P. v. Brown CA1/4 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br>v.<br><br>SHAWN CHRISTOPHER BROWN,<br><br>          Defendant and Appellant. | A160767<br><br>(Solano County<br>Super. Ct. No. VCR228720) |

Defendant Shawn Christopher Brown appeals a judgment convicting him of second degree murder and unlawful possession of a firearm and sentencing him to a term of 18 years to life in prison. He argues that his conviction must be reversed because of evidentiary error, prosecutorial misconduct, instructional error, and ineffective assistance of counsel. We find no prejudicial error and shall affirm the judgment.

## Background

Defendant was charged with the murder of Marlin Edwards (Pen. Code,[1] § 187, subd. (a)) and the unlawful possession of a firearm as a felon (§ 29800, subd. (a)(1)). The information further alleged that defendant used a gun to commit the murder (§ 12022.53, subd. (d)). Prior to trial, defendant pled no contest to the firearm possession charge.

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

1

At trial, it was undisputed that on February 5, 2017, defendant shot and killed Marlin Edwards. The shooting occurred in a two-story, open-air apartment building. From the front of the building, several ground level tunnels lead into the building to the odd numbered apartments and several staircases lead to the even number apartments on the second floor. At the time of the shooting, defendant lived in an odd numbered apartment, either 15 or 17, which was on the ground floor of the building. His apartment was reached via one of the approximately 15-foot external tunnels from the front of the building.

Edwards's body was found on the second level of the building, at the top of the stairway between apartments 6 and 8. His body was on the landing, but his legs remained on the stairs. A red gasoline can, which was later determined to contain urine, was found underneath Edwards's body.

To travel from defendant's apartment to the location where the body was found one would walk through the tunnel towards the front of the building, turn right and travel along the walkway in front of the building, then go up the stairway located between apartments 6 and 8. While traveling along the walkway, one would pass both a flight of stairs going down to an underground laundry room and the stairway leading up to apartments 10 and 12.

Time-stamped still photographs recovered from the surveillance camera at the front of the building show Edwards at 10:21:00 a.m. walking on the ground floor walkway away from defendant's apartment towards the stairs that lead to the second level where his body was found; at 10:22:21 defendant running towards those stairs on the same walkway with a gun; and at 10:22:29 defendant running back towards his apartment. The top of the laundry room stairs and the bottom of the stairs to the second level are

2

visible in the surveillance photographs. Edwards is not depicted in still photographs taken at 10:21:49 and 10:21:55, but an unidentified woman can be seen going down the stairs to the laundry room, and he does not appear in either of the photographs in which defendant can be seen.

Police found a single expended shell casing on the ground floor walkway near apartments 11 and 13. A police detective testified that, as part of his investigation, he stood in the likely firing position based on the location of the casing, to determine if the shooter would have been able to see Edwards at the top of the staircase where his body was found. From that position, he was able to see police personnel in the area where the body was found.

Officers noted that there was a pool of blood directly under Edwards's body surrounding his head and neck. No blood was found on the ground floor leading to the staircase, nor on the stairs or landing that led to Edwards's body on the second floor.

The forensic pathologist who conducted Edwards's autopsy testified that the bullet struck Edwards's jugular vein, then went through his vertebrae and spinal cord. He likely "collapsed immediately," having been paralyzed in his hands, trunk, and legs. The pathologist testified that the injury to the jugular vein would have caused "a great deal of bleeding."

At trial, defendant admitted to several prior convictions for selling drugs and illegally possessing a gun. He testified that he had known Edwards since the 1990's when they sold drugs in the park together. In 2015, after Edwards was released from prison, defendant allowed him to stay at his apartment. Their relationship broke down shortly thereafter, and defendant told Edwards he did not want him staying with him. Between the summer of 2015 and the shooting in February 2017, defendant's home and car were

3

vandalized "about six times" and defendant suspected the damages were inflicted by Edwards. Defendant also received "about 20" threatening letters from Edwards. Defendant reported the vandalism to the police and obtained a stay-away order prohibiting Edwards from contacting him, but the letters and vandalism continued. On one occasion, defendant's home was searched after Edwards told the police that defendant had shot three or four people and had an arsenal of guns in his apartment. According to defendant, Edwards "wrote a letter from a jail to the police accusing me of, like, three or four shootings. He said I had like an arsenal of guns in my apartment and my storage. He said that me and his baby mama was plotting to kill his son . . . and run off with his money. He said that I was mad at him because [he] refused my homosexual advances towards him; I was filming him in the shower. I don't know where all of this came from."

Between November 2016 and January 2017, defendant called the police several times to report seeing Edwards driving near his apartment. According to defendant, the officer's voicemail box was full and "nothing happened."

On February 4, 2017, defendant called the police to report that Edwards had kicked in his door. Defendant had not seen Edwards, but "knew it was him." Defendant borrowed a gun that evening and hid it under his couch cushion.

Defendant testified that the following morning someone attempted to enter his apartment again. According to his version of events, when he asked who was there, the person continued to throw his shoulder against the door like he was trying to force the door open. Defendant peeked out his door and saw Edwards standing with his back to the door with a gas can. Defendant retrieved his gun and went outside to investigate. He saw Edwards

4

approximately 10 to 12 feet away. Edwards was carrying a red gas can and, according to defendant, coming up a set of stairs from the laundry room. Edwards yelled at defendant then reached into his coat as he started to approach defendant. Almost immediately, defendant raised his gun and fired at Edwards. Defendant testified, "He came towards me, reached in his coat, was fittin to pull it out. And then I raised the gun. And as soon as I raised the gun, he kind of like had a shoulder move, like as if he wasn't scared of being hit." Defendant continued, "I pulled the gun up. Well, he came towards me, and I pulled the gun up. And then I went like this. 'Bop.' And then he got hit. I guess he -- I guess he got hit." Defendant finished, "Then he went like this. (Indicating.) Spin. Hit the stair railing. It's like a railing that goes to the steps that go up this way. And then some more steps that go this way. And then he went like this. And as soon as he went this way, I backed up, and I ran in the house."

Defendant testified that he did not intend to kill Edwards. He explained, "I just wanted to just make him leave. But I mean when he was trying to get in at first, I really wasn't tripping. But then once I seen that gas can, I was like, 'Oh, no. Hell no.' And I just feared that he was going to do something to me and my girl and my property, and I had to alleviate that threat. And that's what I feel I had to do." He explained that he did not call the police because "I got tired of dealing with the police. . . . I just -- I didn't want to deal with the police anymore. And I didn't really think that -- I thought he ran, like, ran away. Like if I would have known that he died or was dead, laid out, then I would have called the police. But I thought he ran out the apartments and ran down the street. That's why I really didn't call the police. But I kind of also got tired of calling the police because they weren't doing anything."

After the shooting, he hid his gun and left the building. He was arrested later that day.

In his postarrest interview at the police station, defendant initially denied being the shooter. When confronted with the results of the investigation, defendant admitted to shooting Edwards but described the encounter very differently than he did at trial.[2] Defendant first detailed his former friendship with Edwards and the vandalism and threats that preceded the shooting. With respect to the shooting, defendant told the officers he yelled, "You bitch motherfucker," when he heard someone at his door. When he stepped out of the apartment, he saw a man running away from the apartment carrying what appeared to be a gas can. Defendant chased him, but did not have a clear view of him. Defendant yelled to the man to "get your ass up out of here." Defendant claimed he saw the man keep running after he fired his gun. Defendant was clear that when he shot, the man's back was towards him and he was running away. He was also clear that the man did not say anything to defendant before he shot him.

Defendant admitted that he was angry and frustrated when he shot at the man. He explained, "this shit been goin' on for, like, a year. Bustin' my windows off, bustin' my car windows off. He tried to kick my door in. Me and my girl was in there, she damn near screamin' like, 'Baby, he's back.' Man, I'm like - man, this shit is crazy." He added, "I called the police numerous times and he just keep doin' it, keep doin' it, keep doin' it and he – gettin'

---

[2]     In his opening brief, counsel acknowledges that "Brown made inconsistent statements in his police interview regarding whether he knew that the person he fired the shot at was Edwards. On the one hand, he made several statements indicating that he did not know that the person was Edwards. . . . On the other hand, in describing the shooting, he repeatedly referred to his prior relationship with Edwards and to Edwards's months of harassing and threatening conduct."

away with it, you know what I'm saying? And I can't keep takin' - I g- I got an eviction notice and everything 'cause of this shit. You know what I'm saying? I can't keep takin' this shit." He told the officers that he got the gun to protect his apartment and girlfriend if Edwards came in, but also admitted that Edwards did not enter his apartment that morning and that he chased after the man when he ran away. When the officer asked why he shot Edwards, defendant answered, "Cause he was tryin' to get in my shit." When asked what he was thinking when he shot him, defendant answered, "I was like, 'Man, you punk motherfucker.' And then that was that, really." Finally, when asked what he thought after he shot Edwards, defendant answered, "Well after I shot - see I wasn't tryin' to kill him because I didn't - I didn't - it was only one time. . . . You see what I'm sayin'? I wasn't tryin' to kill him, you know what I'm saying? And then I put the gun back and I was like, 'Man, I can't keep takin' this shit, man, you know what I'm saying? This motherfucker better not come around here no more, man. You know what I'm saying?' " At the conclusion of his interview, defendant volunteered, "Yeah, man. I just was just hella nervous, man, and panicked 'cause it's like this, man. I been doin' good, man, you know what I'm saying? It's like I got out of prison, got on parole, went to college. It's like I'm tryin' to stay away from this bullshit. Just, like, man, this dude just kept disrespecting me, man. I was just - you know what I'm saying? There's nothin' gettin' done about it. Makin' threats, writin' letters, t- I got a couple letters at home, just – I'm like, 'Ugh.' You know what I'm saying? And come up in my house, bustin' out my windows, you know what I'm saying? That shit is - I'm layin' in the bed with my girl, glass come flyin', you know what I mean? I'm like, 'What' - ugh. You know what I'm saying? And ain't nothin' happenin'. You know what I'm saying? It's like, 'Fuck.' "

Defendant's neighbor Reginald McKinney testified on defendant's behalf. McKinney testified that on February 4, he saw a man try to break into defendant's apartment. On the morning of the shooting, he saw the same man "walking kind of fast" away from defendant's apartment "towards the stairs by the laundromat." He saw the man go down the stairs, then defendant came out of his apartment and "said somebody was trying to break in." Seconds later, the man came "rushing up" the stairs by the laundry room. McKinney believed that the man had a gun based on the way he was holding his hand under his jacket. McKinney thought the man was going to shoot them. He "went into shock" and, although he heard "a sound," he did not see what happened. McKinney was arrested later with defendant.

The jury was shown a videotaped recording of McKinney's police interrogation in which he admitted having seen defendant fire his gun. In the police interview, McKinney said that defendant came out of his apartment and said, "That mother fucker's here" and something like he tried "to come in again." Defendant ran past McKinney, fired his gun at the victim, then went back into his apartment. The victim was running away when defendant fired. He was holding something but McKinney couldn't see what it was. He was at the bottom tier of the stairs when defendant shot. McKinney had not seen the victim well enough to recognize him. He just saw the person's back at a distance.

In closing argument, the prosecution argued that this case was "not about self-defense" or a "man defending his home." It was about "revenge and street justice and taking the law into your own hands." The prosecutor detailed the inconsistencies in defendant's stories, first to the detectives then to the jury, and argued that the physical evidence compels a finding that defendant aimed for and intentionally shot Edwards in the head as he was

running up the stairs away from defendant. The prosecutor argued further that even if defendant was "just aiming in his general direction, . . . you have implied malice, which is basically he aimed at him. Obviously that is an act that is so dangerous to human life." Finally, the prosecutor argued that the killing was not justified by self-defense because defendant did not actually or reasonably believe that the immediate use of deadly force was necessary to prevent imminent danger.

Defense counsel argued that the killing was justified by self-defense. He argued, defendant "was confronted by Marlin Edwards who obviously was angry with Mr. Brown, who expressed himself that he was angry with Mr. Brown, that he had harassed and threatened Mr. Brown for months. And here he comes up that stairwell, right at my client. And . . . he is reaching under his coat. What's Mr. Brown to do?" Counsel suggested defendant's reaction was immediate and reasonable under the circumstances. "He is at his home, his apartment complex. Here is a man who has trashed, destroyed, vandalized and turned his life upside down for six or seven months. He has a criminal protective order against this guy. He has been threatened by this man. He poses a threat. There's a criminal protective order in place protecting him from Marlin Edwards. And here he is, aggressive, angry, psychotic, coming at him. And he reacted."

The jury found defendant guilty of second degree murder and found the firearm enhancement allegation to be true. Defendant was sentenced to 18 years to life in prison. Defendant timely filed a notice of appeal.

## Discussion

### 1. *Prior Criminal Conduct*

Prior to trial, the prosecutor moved to admit evidence that defendant was arrested and charged with having committed a shooting in 2011.

9

Defendant opposed the admission of the evidence on the ground that the charges were dismissed prior to the preliminary hearing and the evidence was highly prejudicial. The court ruled the evidence admissible for the limited purpose of impeaching defendant's credibility if he testified.

On cross-examination, the prosecutor asked defendant about the shooting. Initially, the prosecutor sought to establish that defendant and the victim were friends who had a falling out, but defendant denied that they were friends or that they had a falling out. Defendant also denied having "anything against" the victim and denied shooting the victim. The prosecutor then showed defendant a copy of a photographic line-up that included his picture with a circle around it and asked defendant if he knew why the victim would say that defendant shot him. Defendant said that he did not. Defendant admitted that he was arrested and charged with the shooting but pointed out that he was released two weeks later. Defendant denied making threats to the victim while he was in jail. He acknowledged that the police report indicated that defendant thought the victim was a snitch, but defendant denied having heard that.

Despite having indicated that it would instruct the jurors that the shooting was to be used "merely to impeach [Brown] in testimony," not "in any way, shape, or form [as] character evidence," no limiting instruction was given.

Prior to sentencing, defendant moved for a new trial based on the court's failure to exclude the evidence of the prior shooting. The prosecutor argued the evidence was proper impeachment and explained that while the victim was initially cooperative and willing to testify in rebuttal, when the time came to testify, the victim was scared and refused to testify. The court denied the motion.

10

On appeal, defendant contends the trial court abused its discretion in failing to exclude evidence of the shooting under Evidence Code section 352. The Attorney General argues that the evidence was admissible and that any possible error was harmless.

Assuming without deciding that the evidence should have been excluded under section 352, any possible error in its admission was harmless. The parties dispute whether prejudice should be evaluated under the "harmless-beyond-a-reasonable-doubt" test (*Chapman v. California* (1967) 386 U.S. 18, 24), which generally applies to error violative of the United States Constitution, or the "reasonable-probability" test (*People v. Watson* (1956) 46 Cal.2d 818, 836–837), which usually covers error under California law. We need not resolve this dispute as the admission of this evidence, if error, was harmless under either standard.

Defendant, quite reasonably, does not argue that the admission of the prior shooting prejudiced the jury's consideration of his self defense claim. Defendant's trial testimony that he shot Edwards in self-defense was thoroughly discredited. Not only was his testimony inconsistent with his statement to the police immediately after the shooting, but it was also inconsistent with the physical evidence.

The investigator testified that police found a single casing on the ground floor of the building near where defendant is seen in the surveillance camera footage. The forensic pathologist testified that Edwards was killed by a single gunshot wound to his neck. Based on Edwards's injuries, the expert believed Edwards would have "collapsed immediately" and would not have been able to use his legs after being shot. The forensic pathologist also testified that the injury would have caused "a great deal of bleeding." No blood, however, was found in the location where defendant claimed to have

shot Edwards or on the stairs to the second floor. Blood was found only under Edwards's body.

Defendant's attempt to characterize the pathologist's testimony as ambiguous is not persuasive. The pathologist conceded in cross-examination that it was possible that after being shot in the neck, Edwards could have used his arms for three or four seconds. He clarified, however, that if Edwards did not fall immediately, he fell "almost immediately" and confirmed that Edwards would not have been able to climb the stairs from the ground level to the location where his body was found. Edwards is not seen in the surveillance camera footage taken at 10:22:21 and 10:22:29. No reasonable juror could have believed that during those 8 seconds, after being shot, Edwards dragged himself up two flights of stairs using only his arms while also carrying a gas can of urine and not leaving any blood trail on the stairs. There is no likelihood that absent the admission of the prior shooting evidence, the jury would have credited defendant's self-defense claim.

Defendant contends the improper admission of this evidence prejudiced the jury's consideration of his heat of passion defense. (See *People v. Lasko* (2000) 23 Cal.4th 101, 104, 108–110 [A defendant who kills with either express or implied malice as a result of sufficient provocation is guilty of voluntary manslaughter rather than second degree murder.].) The jury was instructed pursuant to CALCRIM No. 570 as follows: "[A] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The

12

provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill in the heat of passion."

Defendant suggests that a reasonable "juror considering whether there was a reasonable doubt as to whether Brown was provoked into 'act[ing] rashly under the influence of an intense emotion that obscured his reasoning or judgment' " might have concluded, as a result of the prior shooting evidence, that "this could not be the case, because Brown was a seasoned violent criminal with a character for shooting people he 'had problems with' after a 'falling out.' " However, although the jury was instructed on heat of passion, defense counsel did not rely on heat of passion in closing argument;

13

he relied instead on defendant's implausible claim of self-defense.[3] Only limited evidence was presented as to defendant's state of mind at the time of the shooting. Defendant did not testify that he was not thinking clearly when he fired the shot. Rather, he testified that at first he "really wasn't tripping" but when he saw the gas can he felt he needed to "alleviate that threat." In his statement to the police, defendant told the officers he pulled the gun and fired towards Edwards because he intended to fire a warning shot to scare him away.[4] Thus, both defendant's trial testimony and his statement to the police demonstrated he was not acting under the heat of passion. Given his trial strategy, any suggestion that the prior shooting evidence might have impacted the jury's consideration of his state of mind is purely speculative and unsupported. (See *People v. Borland (*1996) 50 Cal.App.4th 124, 129 ["It is well established that a defendant may not change his theory of the case for the first time on appeal."]; *People v. Smith* (1977) 67 Cal.App.3d 638, 655 ["It

---

[3] The sole reference to heat of passion came in the prosecutor's rebuttal argument when she noted briefly, "[T]here is a jury instruction about provocation and the effect that it could have on murder or manslaughter. And the thing I want to talk to you about provocation is that provocation must -- it must be a serious provocation. It can't be something that is slight. [¶] It would have to be something sufficient where a reasonable or average person would react with this passion. And I would submit to you that in this particular situation the act of Mr. Edwards in this case where he is jiggling the door handle and the defendant yells at him and he then runs away is not sufficient for somebody to then go and gun him down." Defendant's claim that the prosecutor committed misconduct by misstating the law regarding heat of passion is discussed *post*.

[4] Although defendant volunteered at the conclusion of his police interrogation that he was "hella nervous" and "panicked," this statement does not appear to have referred to his state of mind when he shot Edwards. The last questions posed by the police before this comment related to what defendant did after the shooting, where defendant hid the gun, and whether he would consent to a search of his house to recover the gun.

14

is elementary that a new theory cannot be raised on appeal where, as here, the theory contemplates factual situations the consequences of which are open to controversy and were not put in issue in the lower court."].) Thus, the admission of the prior shooting evidence, if error, was harmless.[5]

## 2. Prosecutorial Misconduct

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Navarette* (2003) 30 Cal.4th 458, 506.) Reversal for prosecutorial misconduct is not required unless the defendant has been prejudiced thereby, that is "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Defendant contends the prosecutor committed prejudicial misconduct during her cross-examination of him and in closing argument. He groups the alleged misconduct into "five categories of error: (1) eliciting and introducing

---

[5] Because admission of this evidence was harmless, we need not consider defendant's additional arguments that the court erred by overruling trial counsel's hearsay objections to the prosecutor's questions regarding the shooting and by failing to instruct the jury that the shooting could be considered only for the limited purpose of assessing defendant's credibility or that the prosecutor committed misconduct by asking those questions. Defendant's remaining claims of prosecutorial misconduct are discussed *post*.

inadmissible evidence; (2) mischaracterizing the evidence; (3) improper vouching; (4) inflaming the passions of the jury; and (5) misstating the law."

The Attorney General contends defendant forfeited all of these claims because he failed to object to any of the alleged misconduct. "Claims of prosecutorial misconduct ordinarily are forfeited for the purpose of appeal unless the defendant objects to the asserted misconduct at trial and requests an admonition to the jury, or an admonition would not have cured the harm." (*People v. Prince* (2007) 40 Cal.4th 1179, 1294.) Defendant acknowledges that his trial counsel did not object to any of these alleged instances of misconduct. Defendant argues, however, that his attorney's failure to adequately object should not prevent this court from reviewing the errors because an objection would have been futile and a curative admonition "would not have cured the harm caused by the misconduct." (Citing *People v. Hill* (1998) 17 Cal.4th 800, 820.)  Contrary to defendant's argument, nothing in the record suggests that a proper objection, if warranted, would have been futile.

Alternatively, defendant argues that this court should exercise its discretion to review the claim because the prosecutor's misconduct implicated "a substantial right." (*People v. Anderson* (2020) 9 Cal.5th 946, 963.) We disagree. None of the alleged errors implicates a substantial right sufficient to overcome the forfeiture rule.

As a further alternative, he contends that if any of his arguments have been forfeited, trial counsel provided ineffective assistance by failing to adequately object. To prevail on an ineffective assistance of counsel claim, defendant "must prove ' "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been

16

more favorable to the defendant." ' [Citation.] ' "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' [Citation.] If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150, citing *Strickland v. Washington* (1984) 466 U.S. 668, 697.)

Within defendant's first category of alleged error, defendant asserts that the prosecutor improperly elicited five pieces of inadmissible evidence: (1) testimony that defendant's conviction for receiving stolen property had been charged as a felony before it was reduced to a misdemeanor; (2) a text message exchanged by defendant's friends suggesting a romantic relationship between defendant and Edwards; (3) testimony that defendant asked if the gun was stolen or used in other crimes before he bought it; (4) portions of a call from jail in which defendant laughed about the victim's death and talked about his reputation for violence; and (5) a letter written to police in which Edwards accused defendant of prior violent acts.

Counsel does not commit misconduct by eliciting evidence that is not subject to an evidentiary ruling or court exclusionary order. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679 [" '[A]lthough it is misconduct for a prosecutor intentionally to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct.' "].) The evidence elicited by the prosecutor was not subject to an exclusionary order nor was it clearly inadmissible as defendant suggests. Defendant's misconduct claim is essentially a belated attempt to challenge the admissibility of the underlying evidence rather than to show improper conduct by the prosecutor. In any event, counsel's failure to object either to the alleged misconduct or to the underlying evidence did not amount to ineffective assistance. Whether or not an objection to any of the

17

challenged evidence would have been sustained, there is no reasonable likelihood that the outcome of the trial would have been different had the evidence been excluded.

Defendant testified that he was previously convicted of, among other things, misdemeanor receiving stolen property. The additional information elicited on cross-examination that the conviction was originally charged as a felony could hardly have affected the jury's evaluation of defendant's credibility.

Similarly, evidence introduced by both the prosecution and the defense raised questions regarding the nature of defendant's relationship with Edwards. In his statement to the police, McKinney characterized the dispute between defendant and Edwards as "some lover shit" and defendant characterized Edwards's letters as "talking some weird psychotic homosexual stuff." The additional evidence elicited by the prosecutor of a text message sent to McKinney by a third person which read, " 'I'm sick' or 'I'm tired' of this [f-g] shit between Butch and Zag' " (Butch and Zag being nicknames for defendant and Edwards), was harmless. The nature of their relationship did not diminish the largely undisputed fact that Edwards had engaged in a campaign of harassment against defendant.

The fact that defendant illegally possessed a gun was admissible impeachment. (*People v. Robinson* (2011) 199 Cal.App.4th 707, 712 [felon in possession of a firearm is a crime involving moral turpitude].) Where he got it, from whom he purchased it, and what questions he asked before buying it, all brought out on cross-examination, added nothing to the admitted facts that he possessed the gun and used it to shoot Edwards. Nor did those matters tend to undermine his claim of self-defense. Their admission without objection was not prejudicial.

Defendant does not dispute that the jury properly heard a jail call in which he said, I "was trying to be patient" but that "when that word disrespect started coming in, I don't take that." He questions the inclusion of additional portions of the call in which he laughed and agreed that Edwards acted stupid, saying, "that shit was funny . . . [he] thought I wasn't at home . . . [c]ause I had rented a car" and he "should have known how I got down." The totality of the call was not necessarily inadmissible. The laughter, to the extent it reflected a lack of remorse, was likely admissible to establish defendant's state of mind at the time of the shooting. (See *People v. Michaels* (2002) 28 Cal.4th 486, 528 ["Absence of remorse is irrelevant to prove that a defendant committed a homicide, but it may be relevant, because it sheds light on the defendant's mental state, in determining the degree of the homicide."].) In any event, the failure to sanitize the call, if error, was harmless. As discussed above, defendant's self-defense claim was thoroughly discredited and his own statements established that he did not shoot at Edwards while under the heat of passion.

Finally, defendant was not prejudiced by the introduction of Edwards's letter to the police. Defendant concedes that he initially brought up the letter when he testified that Edwards falsely accused him of "three or four shootings," as well as having an arsenal of guns, which resulted in the police searching his home. While the letter then introduced by the prosecutor may have provided more details about Edwards's accusations, it was likely admissible under Evidence Code section 356. In any event, the letter merely corroborated defendant's own testimony and was not prejudicial.

Within defendant's second category, defendant asserts the prosecutor's questions to defendant mischaracterized his interview with the police, and her closing argument mischaracterized the police officer's testimony

19

regarding how the security cameras worked. As to the former, in questioning defendant, the prosecutor insisted that when defendant was shown a photograph of Edwards, he told the police that the person in the photograph " 'doesn't have anything to do with' " the shooting, when in fact, defendant was shown a photograph of McKinney, not Edwards. In closing argument, the prosecutor emphasized that the jury should "go back and watch that video" to see defendant "claim[ing] that he did not know that the person that he shot was Marlin Edwards" and that Edwards did not have " 'anything to do with what happened today.' " Defendant acknowledges that his statement to the police was open to interpretation. At times, he denied knowing who he had shot and claimed he could not see the victim because his back was to him. However, he also detailed Edward's vandalism and harassment and explained he was angry because of it. Contrary to defendant's argument, the prosecutor did not rely on defendant's purported lack of knowledge to suggest defendant could not have been acting in the heat of passion. The prosecutor suggested the jury review the video of defendant's police interrogation carefully because defendant cannot claim self-defense "if he doesn't know who the person is that he's allegedly shooting." In any event, during deliberations the jury requested technical assistance to rewatch the video recording of defendant's police interrogation, which presumably corrected the prosecutor's error. The jury had access to both the video and the transcript of defendant's statement to the police, so that it could evaluate defendant's statement for itself and was not likely misled by the prosecutor's mischaracterization.

As to the prosecutor's mischaracterization of the security camera footage, defendant testified on cross-examination that after shooting Edwards he did a "walk-through" of the building that included looking down the laundry room steps. The prosecutor asked questions suggesting that if

20

defendant had walked in that area, he would have been recorded by the surveillance cameras because the camera "goes by movement and . . . you're able to pull still shots from that video." In closing argument, the prosecutor argued that if Edwards had come up the laundry room steps before he was shot, it would have been captured on the video camera. However, the police detective had testified that only limited still images were saved by the video recorder because of a problem with that recorder. But the prosecutor's misstatement undoubtedly was harmless. The jury heard the detective's testimony that he believed only still images had been captured, rather than video, as the result of a technical malfunction by the digital video recorder. Nonetheless, some still images were pulled from that camera and none showed Edwards or defendant on the laundry room stairs. Moreover, as detailed above, significant other physical evidence debunked defendant's self-defense claim relying on Edwards's presence on those stairs, so that the mischaracterization of the nature of the images produced by the security cameras was harmless.

Next, defendant identifies three alleged instances of misconduct in which the prosecutor improperly relied on her years of experience to establish a fact.[6] First, the prosecutor argued, "I have been doing this for 23 years. And my mom would come in and watch me when I was a baby. And she would say to me -- she still comes and watches me. But she would say to me, you know, 'You can get him to admit it.' You know. She would just be waiting for that

_____

[6] Although characterized as "improper vouching" by defendant, it is unclear for whom the prosecutor was vouching. We agree with the Attorney General that the proper objection, if any, is that the prosecutor relied on facts outside the record. (See *People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1259 ["It is well settled that it is 'clearly misconduct' for a prosecutor to make arguments based on facts that are not in evidence that are not matters of common knowledge."].)

Perry Mason moment. [¶] And, you know, there have been a few times in my career where there have been a few Perry Mason moments. But the bottom line is that you can't expect that somebody who is, you know, getting up on the stand is going to admit to you, 'Okay. You got me. I committed this murder.' [¶] I mean they're not going to say that." In response to defense counsel's argument that defendant and McKinney "ha[d] been separated for three years" with "no communication with each other," and yet testified to "the same thing," the prosecutor argued, "And to sit there and say that the two of them have never had any contact, I mean that's just baloney. Y'all are savvy enough. You know that there are ways that people who are in custody can get into contact with each other. They do it all the time. [¶] They can either send letters out to people on the outside who can get into contact. They find ways to contact other people in custody so that they can get into contact. I mean it's just nonsense to think that simply because the two of them are in custody that they did not have any way to get into contact with each other." Finally, in response to defendant's argument that the jury could infer that defendant did not intend to kill Edwards because he only fired one shot, the prosecutor noted that "many, many people are killed with one shot."

While defendant has also forfeited his challenge to these alleged instances of misconduct, it is also clear that the prosecutor referred to no extrajudicial "facts" but matters of common knowledge. The prosecutor did no more than argue why defendant's contentions were implausible. Her argument was within the permissible bounds of closing argument. (See *People v. Brown* (2004) 33 Cal.4th 382, 399–400 [prosecutors are given wide latitude during argument, and " ' "may state matters not in evidence, but which are common knowledge or are illustrations drawn from common

experience" ' "].) In any event, the "facts" were not particularly subject to dispute or significant to defendant's guilt.

Defendant also argues that the prosecutor improperly sought to inflame the passions of the jury by arguing that Edwards did not "deserv[e] to be shot like a dog," or to die "laying on [a] porch," and that he was a "human being" who would never experience another birthday, Thanksgiving, or Christmas. Even if such argument was inappropriate and excessive, it was not prejudicial. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1129–1130 [prosecutor's improper appeal to the jury's sympathy, asking the jury to consider what it meant to be killed and that the victim, "[a] living, breathing human being had all of that taken away" was not prejudicial].) Throughout the trial, the prosecution focused on the evidence of defendant's guilt. This one instance did not convert its request for a guilty verdict into a plea for sympathy for the victim.

Finally, defendant argues that the prosecutor twice misstated the law in closing argument. First, he argues she misstated the law regarding implied malice when she argued, "implied malice is doing an act that is so dangerous to human life, and you know it, and you do it anyway. And firing one shot, ladies and gentlemen, that is so dangerous to human life. When you aim your gun in somebody's direction and you fire that shot, that's implied malice. That's a murder. That's what the law says, plain and simple." Defendant also contends the prosecutor misstated the law regarding the necessary provocation for heat of passion when she argued, "It would have to be something sufficient where a reasonable or average person would react with this passion. And I would submit to you that in this particular situation the act of Mr. Edwards in this case where he is jiggling the door handle and the defendant yells at him and he then runs away is not sufficient for

23

somebody to then go and gun him down. It just -- it just isn't, ladies and gentlemen."

Defendant contends these statements improperly told the jury that the issue of malice "was already decided as a matter of law," thereby reducing the prosecution's burden of proof and improperly suggested that the provocation necessary to establish heat of passion must have been sufficient to cause a reasonable person to kill, not simply to react with his reason and judgment obscured. It is highly questionable whether the prosecutor's statements could be so understood, but in all events those comments were brief and surrounded by proper descriptions of the relevant law. The jury was fully and properly instructed on the law regarding the prosecutor's burden of proof, implied malice and heat of passion. The court also instructed the jury, "If you believe the attorneys' comments on the law conflict with my instructions, you m[u]st follow my instructions." As discussed above, the overwhelming evidence established that defendant did not shoot Edwards in self-defense or under the heat of passion but acted with at least implied malice. There is no reasonable likelihood of a different result had counsel objected to these or to any other statements of the prosecutor. In short, there was no ineffective assistance of counsel.

### 3. *Involuntary Manslaughter*

Defendant contends the court erred in failing sua sponte to instruct on involuntary manslaughter as a lesser included offense of murder. As relevant here, an unintentional killing caused by criminal negligence is involuntary manslaughter. (*People v. Ochoa* (1998) 19 Cal.4th 353, 423 ["[i]nvoluntary manslaughter, when not misdemeanor manslaughter, is criminally negligent unlawful homicide"]; *People v. Brothers* (2015) 236 Cal.App.4th 24, 33–34 [an

unlawful killing in the course of an inherently dangerous assaultive felony without malice is involuntary manslaughter.].)

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) " '[A] trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) Conversely, even on request, a trial judge has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction. (*Ibid*.)

The trial court was required to instruct on involuntary manslaughter as a lesser included offense only if "a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*People v. Brothers, supra*, 236 Cal.App.4th at p. 34.) "We review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant." (*Id.* at p. 30.)

Defendant contends there is substantial evidence to warrant an involuntary manslaughter instruction under the theory that he committed an inherently dangerous assaultive felony and did so without malice. He relies on his statements to the police that he did not intend to kill Edwards and merely fired a single shot in his direction to scare him away. Based on this

testimony, he argues the jury could have found him guilty of the lesser offense of involuntary manslaughter and not murder. We disagree.

The intentional use of violent force against a victim, knowing the probable consequences of one's actions, precludes an instruction on involuntary manslaughter. (*People v. Blakeley* (2000) 23 Cal.4th 82, 91 [defendant cannot commit involuntary manslaughter when acting with conscious disregard for life]; *People v. Evers* (1992) 10 Cal.App.4th 588, 598 [court was not required to instruct jury on involuntary manslaughter where defendant intentionally used violent force against victim knowing the probable consequences of his action].) Firing a gun towards a person, whether or not you intend to kill that person, undoubtedly poses grave danger to human life. (See *People v. Thomas* (2012) 53 Cal.4th 771, 815 [Pointing a loaded gun at the victim's head and threatening to shoot him "is highly dangerous and exhibits a conscious disregard for life."]) Nothing in the record suggests that defendant was unable to appreciate the obvious risk his conduct posed. Even assuming the jury credited defendant's statements to the police, that would not reasonably have justified a finding of involuntary manslaughter rather than murder. (See *People v. Brothers, supra,* 236 Cal.App.4th at p. 35 ["[W]hen . . . the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter. [Citations.] Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence."].)

### 4. *Ineffective Assistance of Counsel*

Defendant contends he received ineffective assistance of counsel in several respects. First he contends his attorney failed to explain to the court the basis on which important testimony was proffered, thereby causing the exclusion of that evidence. When his attorney during direct examination asked him about the last time before the day prior to the shooting that Edwards caused a problem at the apartment building, he answered, "I came home, and . . . [a neighbor] told me that [Edwards] was standing in front of the complex, on the street, yelling and screaming my name, telling me to come out, 'Bitch-ass n[----]. Bring your ass out the house you snitch ass n[----].' " The prosecutor objected on hearsay grounds, and the court sustained the objection. Counsel then asked him whether he was told that Edwards was seen by the neighbor, and he stated he was. The prosecutor objected again on hearsay grounds and also moved to strike. The court sustained the objection and struck the testimony.

His attorney did not explain that the evidence was relevant to defendant's state of mind and was not offered for its truth. Accordingly, he now argues that counsel's failure to assert the proper grounds for admission amounted to ineffective assistance. We agree that the evidence arguably was relevant to defendant's state of mind, but its exclusion was harmless. The jury heard considerable testimony from defendant regarding the vandalism and harassment he believed Edwards had committed. Indeed, the prosecution conceded that Edwards had committed some of the acts of vandalism. The additional incident was no more provocative than the others detailed at trial, including the incident that occurred the night before the shooting when Edwards allegedly attempted to break into defendant's home.

27

Defendant also contends that his attorney improvidently failed to request the court to modify the pattern jury instruction on heat of passion, CALCRIM No. 570, to address provocative acts that defendant "actually and reasonably believed" Edwards had committed.[7] The jury was instructed, "You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570.) Nothing in the instruction indicates that the provocative act must be proven true, so that the absence of the additional instructions was harmless. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 ["[E]ven were we to conclude on this record that a pinpoint instruction should have been given explaining that legally adequate provocation can occur over a considerable period of time, the error would be harmless, as 'nothing in [the standard instructions given] *precluded* the jury from finding adequate provocation resulting from conduct occurring over a considerable period of time.' "].) Moreover, as discussed above, defendant's own statements establish that he was not acting under the influence of

---

[7]     Defendant suggests the pattern instruction should have been modified to include the following bracketed instructions found in the pattern instruction of self-defense: "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] [The defendant's belief that [he] was threatened may be reasonable even if [he] relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true]." (CALCRIM No. 505.)

intense emotion that obscured his reasoning or judgment when he shot Edwards.

Defendant also contends that his attorney rendered ineffective assistance by failing to request that McKinney be permitted to testify unshackled and in street attire, rather than jail clothing, and that McKinney's prior convictions be sanitized. As set forth above, McKinney testified that defendant shot Edwards in self-defense. Like defendant, his testimony was thoroughly discredited by his prior inconsistent statements to the police and the physical evidence. Counsel's failure to request that he testify unshackled and in street attire, if error, was not prejudicial. There is no likelihood of a different outcome had counsel made any such request.

### 5. *Cumulative Prejudice*

Defendant contends the above errors " 'created a negative synergistic effect, rendering the degree of overall unfairness to [the] defendant more than that flowing from the sum of the individual errors.' " He explains, "There was a remarkable amount of evidence at trial that [defendant] fired the shot at Edwards with a less culpable state of mind — either in self-defense, in the heat of passion, or with criminal negligence. Yet the overwhelming synergistic effect of the particular combination of errors was to encourage the improper character inference that [defendant] was a bad person, likely to have fired the shot at Edwards with bad intent. Absent that particular combination of errors and the improper character inference it encouraged, there is a reasonable chance that at least one juror — especially when properly instructed on involuntary manslaughter and the scope of legally cognizable provocation — would have harbored a reasonable doubt as to whether Brown was guilty of murder." We disagree. Viewing the trial as a whole, there is no reasonable likelihood defendant was convicted based on

29

improper considerations. The jury sorted through the charges and rejected the prosecutor's assertion that defendant was guilty of first degree murder. This determination was soundly supported by the physical evidence, as well as defendant's statements to the police. He was fairly convicted of second degree murder.

## Disposition

The judgment is affirmed.

POLLAK, P. J.

I CONCUR:

BROWN, J.

STREETER, J.

I concur in the opinion and disposition, with some reservations. Not only was the admission of the evidence concerning the 2011 shooting of Hearne problematic, but I also see some merit to the argument based on *People v. Brothers* (2015) 236 Cal.App.4th 24, that the failure to instruct on involuntary manslaughter was prejudicial error. We rely on the rule that a defendant cannot be convicted of involuntary manslaughter where he commits a depraved heart killing. But this defendant argues the facts are in conflict on the question of implied malice. He cites the evidence that, without intending to kill, he fired a single shot up the stairwell in circumstances where he did not have a clear view of Edwards. The Attorney General does not contest the defendant's claim of error under *Brothers*, but elides this problem with the glib statement that there was "overwhelming" evidence of implied malice. The evidence on the issue does not seem "overwhelming" to me.

The *Brothers* argument the defendant now advances, to be sure, rests on a fundamentally different interpretation of the evidence than the one he argued at trial. It appears that, at trial, he may have insisted on a self-defense theory that gave him a chance of acquittal but that had a slim chance of succeeding, at best. Because this defense implicitly conceded intent to kill, the obvious risk was that if it failed, some form of murder verdict was inevitable. Foolish as it may have been to elect to proceed on a self-defense theory in these circumstances, there was another interpretation of the evidence available—in a fit of blind rage, the defendant fired his weapon in the victim's general direction but didn't mean to kill him. That theory, too, was far from perfect on this record, but should it have been in front of the jury as an alternative? I think so.

1

If the question was whether substantial evidence supports a finding of reckless disregard for human life, that would be easy. Of course it does. But in analyzing the sua sponte duty to instruct issue, the question we have here is just the opposite. Was there substantial evidence to support a finding the defendant fired wildly from a distance without intending to kill? I don't see why not on this record. *Brothers* rejects a categorical rule that a defendant who kills while engaging in an inherently dangerous felony cannot ever argue involuntary manslaughter. It all depends on the facts, which the jury should have been allowed to assess even if the defendant's theory of defense was incompatible with such a scenario. In the end, however, while the question is close, I am not persuaded the error was prejudicial.

STREETER, J.